CONSUMER FEDERATION OF
AMERICA, Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION; Terrence Scanlon, Chairman of the U.S. Consumer Product Safety Commission, and Carol G. Dawson and Anne Graham, Commissioners of the U.S. Consumer Product Safety Commission, Respondents,

Halogenated Solvents Industry
Alliance, Intervenor.

No. 88-1664.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 18, 1989.

Decided Aug. 29, 1989.

Melvin L. Goldberg, with whom Mary Ellen Fise (for petitioner Consumer Federation of America) and Robert G. Abrams, Washington, D.C., (for amicus curiae The State of N.Y.) were on the joint brief, for petitioner and amicus curiae in support of petitioner.

Jacqueline H. Eagle, Atty., U.S. Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen. at the time the brief was filed, Margaret A. Cotter, Asst. Director, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, D.C., and Steven Lemberg, Asst. Gen. Counsel, and Harleigh Ewell, Atty., Chevy Chase, Md., Consumer Product Safety Com'n, were on the brief, for respondents.

W. Caffey Norman III for intervenor.

Before ROBINSON, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Petitioner Consumer Federation of America seeks review of a United States Consumer Product Safety Commission order denying its petition for the initiation of rulemaking proceedings to ban the use of the solvent methylene chloride in household products. The Federal Hazardous Substances Act authorizes the Commission to designate "banned hazardous substances" and provides that the Commission must act on a private party's petition if the petitioner demonstrates "reasonable grounds" for the requested regulation. The Commission

held that petitioner had failed to meet this threshold requirement. We deny the petition for review because we find the Commission's action reasonable.

## I. BACKGROUND

Under the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261–1276 (1982 & Supp. V 1987) ("Act"), the Consumer Product Safety Commission ("Commission") may classify as a "hazardous substance" any product that is toxic or dangerous for other statutorily prescribed reasons. *See* 15 U.S.C. §§ 1262(a)(1), 1261(f)(1) (1982). Hazardous substances must be suitably labeled. *Id.* §§ 1261(p), 1263(a). The Commission may take the further step of placing a substance in the "banned hazardous substances" category

> on the basis of a finding that, notwithstanding such cautionary labeling as is or may be required under this chapter for that substance, the degree or nature of the hazard involved in the presence or use of such substance in households is such that the objective of the protection of the public health and safety can be adequately served only by keeping such substance, when so intended or packaged, out of the channels of interstate commerce.

*Id.* §§ 1261(q)(1)(B), 1263(b).

To initiate a rulemaking, the Act provides (by cross-referencing the Food, Drug and Cosmetic Act, *see id.* § 1262(a)(2)) that

> [a]ny action for the issuance, amendment, or repeal of any regulation ... shall be begun by a proposal made (A) by the Secretary on his own initiative, or (B) by petition of any interested person, showing reasonable grounds therefor, filed with the Secretary. The Secretary shall publish such proposal and shall afford all interested persons an opportunity to present their views thereon, orally or in writing.

21 U.S.C. § 371(e)(1) (1982).

In 1985, the Consumer Federation of America ("CFA") petitioned the Commission to institute rulemaking proceedings to declare methylene chloride both a hazardous substance and a banned hazardous substance. Exposure to methylene chloride, a solvent used in paint strippers and other products, is suspected of increasing the risk of certain forms of cancer.

On August 20, 1986, the Commission proposed a rule that would classify household products containing methylene chloride as hazardous substances. 51 Fed.Reg. 29,778 (1986). After receiving comments from the public, the Commission on September 14, 1987 issued a "Statement of Interpretation and Enforcement Policy" ("Statement") declaring that household products exposing consumers to significant amounts of methylene chloride vapor constitute hazardous substances. 52 Fed.Reg. 34,698, 34,699 (1987). The Statement set forth several requirements for cautionary labeling and warned that the Commission intended to bring enforcement actions against persons responsible for the sale of improperly labeled products. *Id.*

The Commission chose to issue the Statement rather than proceed with the requested rulemaking because it found a sufficient amount of uncontested evidence to warrant the conclusion that methylene chloride qualifies as a hazardous substance. The Commission feared that if it followed through with the rulemaking, various procedural hurdles would prevent it from regulating the sale of the chemical for a number of years. *Id.* at 34,700. The Commission did not withdraw the proposed rule, however, and emphasized that if it became apparent that voluntary compliance coupled with enforcement actions against noncomplying firms proved inadequate to ensure cooperation, it reserved the right to resume the rulemaking. *Id.*

On June 17, 1988, the Commission issued a formal denial of the CFA's second request; namely, that the Commission institute proceedings to ban methylene chloride. U.S. Consumer Product Safety Commission, Order Denying Petition HP 85–1 (June 17, 1988) ("Order"). The Commission found that the CFA had failed in several respects to meet the statutory requirement that an interested person show "reasonable grounds" for initiating a rulemaking under 21 U.S.C. § 371(e)(1). First, the Commis-

sion faulted the CFA for failing to specify whether it sought a ban on all household products containing methylene chloride or only a ban on products containing the compound at or above a certain concentration. The Commission questioned whether a limit on concentration would produce beneficial results because consumers might compensate for the diluted product by increasing periods of exposure—for example, by applying multiple coats of paint stripper. Order at 2–3.

Second, the Commission argued that a prohibition at this point was premature because the agency had not had an opportunity to measure the impact that labeling combined with other efforts (e.g., point of sale and media campaigns) would have on consumer behavior. Third, it expressed concern that the initiation of the ban proceeding would thwart its efforts to negotiate with the chemical industry for measures to curb the chemical's harm, such as consumer education campaigns. Fourth, the Commission feared that a prohibition would cause manufacturers to substitute more harmful chemicals for methylene chloride. Fifth, the Commission noted that, before instituting a ban under the statute, it had to determine that the benefits of banning methylene chloride bore a reasonable relation to the costs and that a ban was the least burdensome requirement that prevented or adequately reduced the health risk. The Commission believed that it lacked sufficient information to make these findings. *Id.* at 4–6. It insisted, however, that its decision did not mean

> that banning or limiting methylene chloride in certain products would not be considered in the future as additional information becomes available. The Commission's staff will continue to examine and investigate the situation involving methylene chloride in household products, and the Commission will take prompt and appropriate action where necessary to protect consumers.

*Id.* at 7.

The CFA petitioned for review of the Commission's order, claiming that the Commission had applied an unreasonably demanding standard in determining whether the CFA had put forward "reasonable grounds" to justify the initiation of rulemaking. Petitioner also argued that the Commission did not adequately support its conclusion that the CFA had not presented reasonable grounds. We have jurisdiction under 15 U.S.C. § 1261(q)(2) and 21 U.S.C. § 371(f)(1).

## II. DISCUSSION

### A. The "Reasonable Grounds" Standard

The CFA first attacks the Commission's definition of "reasonable grounds" as used in 21 U.S.C. § 371(e)(1). Because petitioner challenges an agency's interpretation of a statute that the agency is entrusted to administer, *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1987), provides the appropriate standard of review. If congressional intent on the question at issue is clear, we will enforce that intention and not defer to the agency; if legislative intent is unclear, we will uphold the agency as long as its interpretation is "permissible." *Id.* 467 U.S. at 842–45, 104 S.Ct. at 2781–83.

In denying the CFA's petition, the Commission stated that "reasonable grounds in the initial petition are grounds from which it is reasonable to conclude that the Commission would be able to make the findings required to issue the requested rule and to support those findings with substantial evidence in the record." Order at 2.

The CFA argues that the standard is unreasonably demanding because it assertedly requires that a petition contain the facts that the hearing procedure is designed to elicit. We believe that the CFA has exaggerated the harshness of the Commission's standard. As we read it, the standard merely requires the petitioner to proffer sufficient preliminary data to demonstrate that it is worth the Commission's while to initiate a rulemaking.

We cannot fault the Commission for establishing this preliminary requirement given the burden that a rulemaking places on the Commission. For example, the Act requires that the Commission appoint a

"chronic hazard advisory panel" to determine whether the substance at issue is carcinogenic before it can even issue an advance notice of proposed rulemaking for a regulation banning a hazardous substance. 15 U.S.C. §§ 2077, 2080(b)(2)(A)(iii); *see also* 21 U.S.C. § 371(e) (imposing various procedural prerequisites to the conclusion of rulemaking).

We also note that the Commission's interpretation is fully consistent with that of the Food and Drug Administration ("FDA"). In its regulations, the FDA has interpreted the term "reasonable grounds," as used in section 371(e)(1), as placing a formidable burden on petitioners. Under FDA regulations, in order to satisfy this prerequisite for the initiation of rulemaking, an interested person must provide the FDA with the exact wording of the proposed regulation, a full statement in well-organized format of the factual and legal grounds upon which the petitioner relies, and representative information known to the petitioner that is unfavorable to his position. The petition must also contain information on environmental impact and, if requested by the FDA, on economic concerns as well. *See* 21 C.F.R. § 10.30(b) (1988).

The CFA contends that the Commission's definition of "reasonable grounds" conflicts with the Ninth Circuit's decision in *PACTRA Industries v. CPSC*, 555 F.2d 677 (9th Cir.1977). That case, however, did not deal with the initiation of rulemaking. Rather, it involved a challenge to the Commission's standard for determining when, for the purposes of section 371(e)(2), an interested party has stated grounds for holding a hearing *after* the Commission announces a final rule or an order terminating a rulemaking proceeding. Under the statute, a person objecting to such a rule or order need only put forward "grounds" for holding a hearing, as opposed to the "reasonable grounds" required under section 371(e)(1). Based upon this difference in the statutory language, the *PACTRA* court explicitly contrasted the Commission's lack of discretion under 371(e)(2) with the wide latitude allowed it under 371(e)(1):

The only element of discretion afforded the Secretary [of HEW] to dispose summarily of proposals to issue, amend, or repeal regulations under section 371(e) has been, since 1938, the power to dismiss at the outset those proposals by third parties which do not state "reasonable grounds." This expressed discretionary authority to refuse at the outset to entertain third party proposals serves to emphasize the absence of discretion to deny a hearing on a proposed regulation once the regulation has been published after the notice and comment stage.

*Id.* at 683–84 n. 11.

Nor are the other two cases relied upon by the CFA relevant. *Cook Chocolate Co. v. Miller*, 72 F.Supp. 573 (D.D.C.1947), does not address the proper standard for determining whether a petition has set forth "reasonable grounds." Equally unpersuasive is *Committee for Hand Gun Control, Inc. v. CPSC*, 388 F.Supp. 216 (D.D.C. 1974), which involved the Commission's denial of a citizen group's petition for a ban on handgun ammunition. The Commission refused to initiate a rulemaking proceeding on the ground that Congress had prohibited it from banning handgun ammunition. The court disagreed and ordered the Commission to publish the citizen organization's proposal for comment, stating that it did "not understand [the Commission] to argue seriously that [the citizen group had] failed to call into *serious question* whether the existing regulation [requiring only labeling of handgun ammunition] should be altered." *Id.* at 220 (emphasis added).

CFA reads the court's statement in *Committee for Hand Gun Control* as announcing a "serious question" standard for determining whether a petitioner has met the "reasonable grounds" requirement under section 371(e)(1). We decline to place this much weight on the district court's words as neither the appropriate standard for determining "reasonable grounds" nor the public interest group's ability to satisfy this standard were at issue in the case.

In sum, we are unpersuaded by petitioner's arguments and conclude that the Com-

mission's construction of "reasonable grounds," as set forth in its Order, represents a permissible interpretation of section 371(e)(1).

### B. The Commission's Justifications

The CFA also attacks the Commission's grounds for denying its petition. We apply an extremely deferential standard of review to an agency's refusal to institute rulemaking proceedings. Our role "is limited to ensuring that the agency has adequately explained the facts and policy concerns it relied on, and that the facts have some basis in the record." *Arkansas Power & Light Co. v. ICC*, 725 F.2d 716, 723 (D.C.Cir.1984). We will grant the petition for review "only in the rarest and most compelling of circumstances." *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C.Cir. 1981). Compelling circumstances "primarily involve plain errors of law, suggesting that the agency has been blind to the source of its delegated power." *State Farm Mut. Auto. Ins. Co. v. Department of Transportation*, 680 F.2d 206, 221 (D.C. Cir.1982), *vacated on other grounds sub nom. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ The CFA reiterates many of the arguments discussed above and criticizes the Commission's position that a ban at this point would be premature because the Commission has not yet had an opportunity to observe the impact that labeling will have on consumer behavior. Although the statute requires the Commission to determine that labeling will not protect public health and safety before it bans a substance, *see* 15 U.S.C. § 1261(q)(1)(B), the Commission, according to the CFA, should have devised studies to see if labeling methylene chloride would prove effective rather than waiting to observe the impact that labeling would have in practice. The CFA suggests, for example, that the agency might have conducted an experiment similar to a manufacturer's marketing study by inviting a sample of consumers to use various products containing the chemical and observing whether persons heeded the labels on the back of the containers.

The CFA finds support for this argument in the Act's legislative history. The Conference Committee Report states:

> The Conferees recognize the inherent difficulty in proving or disproving the potential efficacy of labels and instructional data in determining the least burdensome requirement which prevents or adequately reduces a risk of injury. While the Conferees intend to require the Commission to undertake positive steps to study contemplated labeling or instructional rules, they do not intend to require that the need for performance standards or bans be proved with mathematical accuracy. For example, a study of the reaction of a sample of consumers to warning labels or instructions might be sufficient to determine whether or not performance requirements were justified under this section. More general studies, or studies of warnings or instructions regarding related risks of injury, might be sufficient as well.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 875 (1981).

Although this passage supports the position that the Commission may conduct investigations of the type suggested by petitioner, it falls far short of a command that the Commission perform studies of this kind. Even if we were to read this statement so stringently, we would hesitate to impose this requirement on the Commission, given the absence of any comparable mandate in the statute's text. Moreover, the CFA's petition did not specifically urge the Commission to institute the type of test that it now suggests.

■ In a related argument, the CFA contends that the Commission acted arbitrarily and capriciously when it instituted the labeling requirement for methylene chloride because it failed to consider the alternative of banning the chemical. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983) (agency must address alternatives and give adequate reasons for their abandonment). We

decline to accept this argument for two reasons. First, the CFA only sought review of the Commission's June 17 order denying the CFA's petition for a ban. We have not been asked to consider the agency's September 1987 statement of enforcement policy that instituted the labeling requirement. Second, even if the CFA's claim were properly before us, we would reject it. The Commission's June 17, 1988 order explains why the Commission, at this time, believes that labeling is preferable to a methylene chloride ban. The Commission, for example, argues that it is not yet able to make the findings that the statute requires it to make before banning a chemical. Order at 3–4, 6.

■ The CFA raises other objections to the Commission's various reasons for denying the organization's petition. For example, the CFA contends that the chemical industry is unlikely to cooperate with the Commission. The CFA also disputes the Commission's position that a ban on methylene chloride is undesirable because manufacturers might respond to a ban by substituting other more harmful chemicals for methylene chloride; according to the CFA, the Commission should deal with this potentiality by regulating the substitutes that manufacturers use rather than leaving methylene chloride on the market.

While some of the Commission's judgments may be subject to question, Congress has entrusted the responsibility to make them to the Commission and not this court. We cannot conclude that this is that rare and compelling case that would justify our overturning the Commission's refusal to institute a rulemaking. *See National Ass'n of Regulatory Utility Comm'rs v. Department of Energy*, 851 F.2d 1424, 1430 (D.C.Cir.1988).

■ Finally, we reject the CFA's contention that the Commission unreasonably delayed acting upon its petition for a methylene chloride ban. The record reveals that the Commission began considering methylene chloride regulation even before the CFA filed its petition in September 1985.

III. CONCLUSION

We find that the Commission's standard for evaluating "reasonable grounds" is permissible, and that the Commission correctly applied that standard in this case. Accordingly, we deny the CFA's petition for review.

*So ordered.*