Lewis C. BIERMAN, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 92–1444.

United States Court of Veterans Appeals.

Argued Nov. 30, 1993.

Decided Jan. 4, 1994.

Ronald L. Smith, Washington, DC, with whom Rick Surratt (non-attorney practitioner) was on the briefs, for appellant.

Michael A. Leonard, with whom Mary Lou Keener, Gen. Counsel, Norman G. Cooper, Asst. Gen. Counsel, and R. Randall Campbell, Deputy Asst. Gen. Counsel, Washington, DC, were on the pleadings, for appellee.

Before NEBEKER, Chief Judge, and KRAMER and FARLEY, Judges.

FARLEY, Judge:

This is an appeal from a March 16, 1992, decision of the Board of Veterans' Appeals (BVA or Board) which denied entitlement to a disability rating for neurological deficits of the right external popliteal nerve separate from and in addition to appellant's current 60% rating under diagnostic code (DC) 5293 of VA's rating schedule for intervertebral disk syndrome (IDS). For the reasons discussed below, the Court will vacate the BVA decision and remand the matter for readjudication consistent with this opinion.

## I. FACTUAL BACKGROUND

Appellant served in the United States Army from October 1942 until his discharge in March 1944 due to a herniated disk between the fourth and fifth lumbar vertebrae which resulted in intractable low back pain and right sciatic radiation. (R. at 13, 30–31, 89–91, 100–01). The past VA adjudications relevant to our review may be summarized as follows:

· A VA regional office (RO) rating decision dated April 20, 1944, awarded appellant a 40% disability rating for service-connected "LIMITATION OF MOTION ANALOGY FOR RUPTURED INTERVERTEBRAL DISC" under DC 1830 of VA's then controlling 1933 rating schedule, effective the day after his separation from service. R. at 115.

· In January 1948, the RO, using the VA's 1945 Schedule of Ratings, continued his 40% rating under DC 5292, for "LIMITATION OF MOTION, LUMBAR SPINE, SEVERE, RESIDUAL OF HERNIATED DISC, WITH HYPERTROPHIC ARTHRITIS, [RIGHT] SACRO-ILIAC." R. at 142.

· In May 1962, following the surgical excision of a herniated disk at the L4–L5 level, the RO reduced to 10% appellant's service-connected rating for his back condition, again under DC 5292, effective July 1962. R. at 152.

· In November 1962, appellant submitted to the RO a statement from a private physician who indicated that appellant still had a noticeable back disability and that there was a definite possibility that a measurable degree of disability would continue after the normal one-year convalescent period for his disk surgery. R. at 155–56. Shortly thereafter, appellant submitted a December 1962 statement of a private neurologist who indicated that appellant had residuals of S–1 radiculitis and that there might also be an underlying osteoarthritis of the lumbar spine. R. at 162. (Radiculitis is an "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal," see DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (DORLAND'S) 1405 (27th ed. 1988); osteoarthritis is "noninflammatory degenerative joint disease occurring chiefly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." Id. at 1197.) In a decision dated December 18, 1962, the RO restored appellant's 40% rating based on the findings of the two private physicians, but the diagnostic code for the rating was changed from 5292 (limitation of motion, lumbar spine) to 5293 (IDS). R. at 166. (According to THE MERCK MANUAL (16th ed. 1992), the etiology of IDS may be described as follows:

Spinal vertebrae are separated by cartilaginous disks that consist of an outer annulus fibrosus and an inner nucleus pulposus. Degenerative changes (with or without trauma) result in protrusion or rupture of the nucleus through the annulus fibrosus in the lumbosacral or cervical area; the nucleus moves posterolaterally or posteriorly into the extradural space. When the herniated nucleus compresses or irritates the nerve root, sciatica results. Posterior protrusion can compress the cord or cauda equina, especially in a patient with a developmentally narrow spinal canal (spinal stenosis).

In the lumbar area, [more than] 80% of disk ruptures affect L5–S–1 nerve roots. Severe L–5 radiculopathies cause foot drop with weakness of the anterior tibial, posterior tibial, and peroneal muscles and sensory loss over the shin and dorsal foot. . . .

Id. at 1515.)

· Appellant underwent a VA special orthopedic examination in February 1965. The examiner noted, inter alia, that there was limitation of motion of the lumbar spine amounting to about 80% in all directions; that there was a partial foot drop on the right; that there seemed to be some weakness of the peroneal muscles, causing the foot to have the tendency to invert; that the right foot seemed to be insensitive to touching; and that the left leg was about one inch shorter than the right, resulting in a tilting of the pelvis and scoliosis. R. at 180. (Foot drop is defined as "a condition in which the foot hangs in a plantar-flexed position, due to lesion of the peroneal nerve." DORLAND'S at 648.)

· During a February 1968 VA special neurological examination, appellant was diagnosed with residuals of a herniated disk at the L4–L5 level with marked weakness of the dorsal flexures of the foot, producing foot drop and hypesthesia of the foot and leg. R. at 192. A VA special orthopedic examination conducted on the same date revealed that appellant had low back pain with 90% limitation of motion of the lumbar spine in forward bending but only 50% in lateral bending, and muscle spasms and foot drop in the right leg. R. at 193. The examiner noted that in order to walk, appellant had to lift his right foot up to prevent dragging of his toes. *Id.* Based on the findings of the February 1968 examinations, in a rating decision dated March 20, 1968, appellant's service-connected rating was increased from 40% to 60% under DC 5293 for "[POST-OPERATIVE] RESIDUALS HERNIATED INTERVERTEBRAL DISC," effective February 15, 1968. R. at 195. Appellant also was awarded special monthly compensation for loss of use of his right foot under 38 U.S.C.A. § 314(k) (now § 1114(k) (West 1991)). R. at 196.

· In January 1971, appellant underwent a VA special neurological examination. The examiner diagnosed appellant with residuals of a herniated disk L4–L5 level, with nearly complete paralysis of the dorsiflexors of the foot and with the muscles of eversion in the foot resulting in an inversion injury and with extensive anesthesia of the leg below the knee, unresponsive to pinprick, vibration, and position sense. R. at 202–03. The RO confirmed its previous rating decision in February 1971. R. at 206.

In March 1990, appellant's service representative requested that appellant be awarded a separate 40% evaluation under DC 8521 (paralysis of the external popliteal nerve (common peroneal)), in addition to his 60% rating for IDS, in order to compensate him for the secondary neurological residuals of his IDS affecting his external popliteal nerve and resulting in his foot drop. R. at 259. The service representative annexed to the letter a copy of a BVA decision in another case in which such separate evaluations had been granted on the basis that the 60% rating for pronounced IDS encompassed some

neurological pathology of the lower extremity but not the full level of impairment evident in that case. R. at 260–64. In a rating decision dated April 1990, the RO denied appellant's claim for an increased rating on the grounds that compensation for appellant's right leg condition already was encompassed by the 60% rating under DC 5293. R. at 267. Appellant filed a Notice of Disagreement with the RO in September 1990, a Statement of the Case was timely issued, and appellant perfected an appeal to the BVA the following month. R. at 269–76.

In a decision dated May 7, 1991, the BVA remanded the claim to the RO with directions to obtain current neurological and orthopedic evaluations and to prepare a Supplemental Statement of the Case (SSOC) considering all appropriate diagnostic codes in evaluating appellant's service-connected back disorder. R. at 287–89. The additional neurological and orthopedic examinations were conducted in June 1991. R. at 295–317. The examinations revealed the following findings: appellant walked with a typical dropfoot gait without the use of a cane; with the cane and his dropfoot brace, his tendency was well compensated for, although it was noted that there was some inversion of the foot at heel strike, which was thought susceptible to correction with adjustment of the brace; on forward bending, he could reach to within 12 inches of the floor, at which point there was some right leg discomfort, especially in the posterior knee region; mild back symptoms were noted; all lumbar motions were markedly restricted; straight leg raising was 70 degrees with posterior knee discomfort for the right leg and 80 degrees for the left leg; knee reflexes were 2/2 and ankle reflexes were 0/trace; sensations were diminished in the right lateral thigh as well as on both the medial and lateral aspects of the calf and foot; there was no active dorsiflexion of the ankle or toe extensors demonstrated; thigh measurements were equal; the right calf was two (2) centimeters smaller than the left calf; x-rays revealed narrowing of the lumbosacral disk spacing as well as some arthritic changes; electromyogram studies indicated a peripheral neuropathy in the lower extremities and to a lesser degree in the upper extremities. In a November 6, 1991,

decision, the RO confirmed its previous decision. An SSOC was provided to appellant later that month. R. at 321–24.

In a March 16, 1992, decision, the BVA denied appellant's claim of entitlement to a separate rating for the neurological deficits of his back disorder on the basis that those neurological deficits already were compensated for as part of his service-connected rating for IDS. *Lewis C. Bierman,* BVA 92–05870 (Mar. 16, 1992). Thereafter, on April 13, 1992, appellant filed with the Chairman of the BVA (Chairman) a motion for reconsideration of the BVA's March 1992 decision. Specifically, appellant asserted that the BVA failed to properly apply the provisions of 38 C.F.R. §§ 3.310 (dealing with secondary conditions), 4.71(a), DC 5293 (diagnostic ratings for IDS), and 4.124(a), DC 8521 (diagnostic ratings for paralysis of the common peroneal nerve), and failed to set forth adequate reasons or bases for its decision. R. at 332–33.

On September 22, 1992, appellant was notified by the Office of the Chairman that his motion for reconsideration had been denied on the basis that his current 60% rating for IDS already compensated him for the neurological deficits and their effects for which he was seeking a separate compensable rating. The letter, however, did take specific note of the fact that individual BVA panels had treated similar claims inconsistently:

> In the past, some sections of the Board were of the opinion that the neurological deficits, including footdrop, caused by [IDS] should receive a separate disability evaluation. Because of the difference among the sections and in order to obtain Board-wide rating consistency, with respect to intervertebral disc syndrome, a group from the senior staff was asked to study problems resulting from the inconsistency and to recommend guidelines. The Board has adopted the staff's recommendation.

R. at 340–41.

Attached to the letter was a copy of the BVA Chairman's Memorandum, No. 01–92–23, dated August 10, 1992, which set out the BVA's new policy with respect to rating IDS claims with secondary foot drop. R. at 342–45. The Chairman's memorandum highlighted the inconsistent positions taken by various BVA panels in rating IDS with secondary foot drop. According to the Chairman, the majority of panels treated the entire disability picture, including the foot drop, as encompassed in a 60% rating under DC 5293; the minority awarded a separate rating for the foot drop under DC 8521 in addition to the 60% rating for IDS. The Chairman indicated that both the majority and minority approaches recognized the availability of an assignment of an additional amount of special monthly compensation for loss of use of the foot under 38 U.S.C.A. § 1114(k). R. at 342; *see also* 38 C.F.R. § 4.63 (1993). The Chairman's memorandum articulated a single Board policy for evaluating future claims of IDS with secondary foot drop:

> The Schedule for Rating Disabilities provides a specific [DC] for the evaluation of [IDS]. Therefore, the initial step in rating service-connected discogenic disease is to consider the specific criteria set forth in [DC] 5293. When it is clear from the medical evidence of record that a footdrop is the result of radiculopathy attributable to a service-connected [IDS], a single rating of sixty percent ... ordinarily will be assigned under [DC] 5293 of the Schedule for Rating Disabilities. In exceptional cases, an extraschedular rating may be appropriate under the authority of 38 C.F.R. § 3.321(b) (1991). Development of the clinical evidence should be undertaken when there is an indication in the record that any peripheral neuropathy may be secondary to a cause or causes other than the service-connected disc disease. Additional adjudicative action may then be required.

R. at 343–44. As the reasoning behind the new policy, the Chairman stated:

> Pronounced [IDS] which is rated sixty percent ... under [DC] 5293 contemplates a significant level of peripheral neuropathy appropriate to the site of the diseased disc. Arguably, an evaluation of sixty percent ... under [DC] 5293 encompasses the severest form of peripheral neuropathy with the exception of complete or incomplete sciatic nerve paralysis. In order for a herniated disc to cause a complete paraly-

sis of the sciatic nerve, the herniation would have to cause disruption of function of the fourth and fifth lumbar and the first, second and third sacral nerve roots, an anatomically improbable condition.

R. at 344–45. In December 1992, appellant timely filed a Notice of Appeal of the BVA's March 16, 1992, decision with this Court.

In a memorandum dated February 9, 1993, based on a challenge by the Disabled American Veterans that the Chairman's action in Memorandum No. 01–92–23 may have constituted substantive rule-making subject to the notice and comment procedures of the Administrative Procedure Act, the Chairman, on the advice of the Office of General Counsel, rescinded Memorandum No. 10–92–23. *See* Chairman's Memorandum No. 01–93–03 (Feb. 8, 1993) (attached to Appellant's Br.); *Fugere v. Derwinski,* 1 Vet.App. 103 (1990).

## II. APPLICABLE LAW

In order to establish entitlement to benefits for a disability claimed to have originated during wartime active service, a veteran must show that the particular disability resulted from either an injury suffered or disease contracted in the line of duty or that a preexisting injury or disease was aggravated during such service. 38 U.S.C.A. § 1110 (West 1991); 38 C.F.R. § 3.303(a) (1993). Where a disability is proximately due to or the result of a service-connected disease or injury, it also will be considered service connected. 38 C.F.R. § 3.310 (1993).

Disability evaluations are rendered based upon a Schedule for Rating Disabilities (Schedule) adopted by the Secretary (set forth at 38 C.F.R. Part 4 (1993)), which is designed to compensate the veteran for reductions in earning capacity resulting from specific injuries or combinations of injuries. 38 U.S.C.A. § 1155 (West 1991). In summarizing the general policy behind the Schedule, a pertinent VA regulation provides:

[The] rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practically be de-termined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations. Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. For the application of this schedule, accurate and fully descriptive medical examinations are required, with emphasis upon the limitation of activity imposed by the disabling condition.

38 C.F.R. § 4.1 (1993).

In evaluating a disability, the Schedule requires the rating board to consider the functional impairment caused by the particular disability:

The basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment. Whether the upper or lower extremities, the back or abdominal wall, the eyes or ears, or the cardiovascular, digestive, or other system, or psyche are affected, evaluations are based upon lack of usefulness, of these parts or systems, especially in self-support. This imposes upon the medical examiner the responsibility of furnishing, in addition to the etiological, anatomical, pathological, laboratory and prognostic data required for ordinary medical classification, full description of the effects of disability upon the person's ordinary activity. In this connection, it will be remembered that a person may be too disabled to engage in employment although he or she is up and about and fairly comfortable at home or upon limited activity.

38 C.F.R. § 4.10 (1993). *See also* 38 C.F.R. § 4.40 (1993) (requiring rating board to consider functional loss, i.e. "the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance," in evaluating disabilities of the musculoskeletal system).

The Schedule specifically instructs VA rating boards to avoid "pyramiding" or "[t]he evaluation of the same disability under various diagnoses." 38 C.F.R. § 4.14 (1993). In describing such prohibited "pyramiding," VA's regulations provide:

> Disability from injuries to the muscles, nerves, and joints of an extremity may overlap to a great extent so that special rules are included in the appropriate bodily system for their evaluation. Dyspnea, tachycardia, nervousness, fatigability, etc., may result from many causes; some may be the use of manifestations not resulting from service-connected disease or injury in establishing the service-connected evaluation, and the evaluation of the same manifestation under different diagnoses are to be avoided.

*Id.* Accordingly, in several instances, the Schedule contains express prohibitions against awarding separate ratings for closely associated functions. *See, e.g.,* 38 C.F.R. §§ 4.55(g) (1993) ("Muscle injury ratings will not be combined with peripheral nerve paralysis ratings for the same part, unless affecting entirely different functions."); 4.113 (noting that certain diseases of the digestive system "do not lend themselves to distinct and separate disability evaluations without violating the fundamental principle relating to pyramiding as outlined in § 4.14."); 4.115 ("Separate ratings are not to be assigned for disability from disease of the heart and any form of nephritis, on account of the close interrelationship of cardiovascular disabilities."); 4.96 (ratings of various specified respiratory conditions will not be combined). In certain situations in which overlapping disabilities are intended to receive less than full separate ratings, VA also has promulgated special rules. *See, e.g.,* 38 C.F.R. §§ 4.55(a) ("Muscle injuries in the same anatomical region, i.e., (1) shoulder girdle and arm, (2) forearm and hand, (3) pelvic girdle and thigh, (4) leg and foot, will not be combined, but instead, the rating for the major group will be elevated from moderate to moderately severe, or from moderately severe to severe, according to the severity of the aggregate impairment of function of the extremity."); 4.80 ("Combined ratings for disabilities of the same eye should not exceed the amount for total loss of vision of that eye unless there is an enucleation or a serious cosmetic defect added to the total loss of vision."). Further, in recognizing that a single disease entity may result in separate ratable disabilities, VA's regulations also provide that

> [e]xcept as otherwise provided in [the] schedule, the disabilities arising from a single disease entity, e.g. arthritis, multiple sclerosis, cerebrovascular accident, etc., are to be rated separately as are all other disabling conditions, if any. All disabilities are then to be combined as described in paragraph (a) [describing the use of the Combined Ratings Table] of this section.

38 C.F.R. § 4.25(b) (1993).

In the Schedule, diagnostic codes 5285–5295 apply to disabilities of the spine. 38 C.F.R. § 4.71a, DC 5285–5295 (1993). In evaluating a claim based on IDS, the Schedule provides the following guidelines:

| | |
|---|---:|
| Pronounced; with persistent symptoms compatible with sciatic neuropathy with characteristic pain and demonstrable muscle spasm, absent ankle jerk, or other neurological findings appropriate to site of diseased disc, little intermittent relief | 60 |
| Severe; recurring attacks, with intermittent relief | 40 |
| Moderate; recurring attacks | 20 |
| Mild | 10 |
| Postoperative, cured | 0 |

38 C.F.R. § 4.71a, DC 5293 (1993).

Disabilities of the peripheral nerves are rated under a section of the Schedule entitled, "Neurological Conditions and Convulsive Disorders." 38 C.F.R. §§ 4.120–4.124a (1993). For a claim based upon paralysis of the external popliteal nerve (common peroneal), the Schedule provides:

| | |
|---|---:|
| Complete; foot drop and slight droop of the first phalanges of all toes, cannot dorsiflex the foot, extension (dorsal flexion) of proximal phalanges of toes lost, adduction weakened; anesthesia covers entire dorsum of foot and toes | 40 |
| Incomplete: | |
| Severe | 30 |
| Moderate | 20 |
| Mild | 10 |

38 C.F.R. § 4.124a, DC 8521 (1993). The Schedule also provides that "[c]omplete paralysis of the external popliteal nerve (com-

mon peroneal) and consequent footdrop, accompanied by characteristic organic changes including trophic and circulatory disturbances and other concomitants confirmatory of complete paralysis of this nerve, will be taken as loss of use of the foot" for purposes of entitlement to special monthly compensation. 38 C.F.R. § 4.63(b) (1993).

■ This Court recently has held that the determination of whether the correct diagnostic code was selected by the VA or BVA in a particular case is neither a pure factual question nor a pure legal one; rather, it is a mixed question involving the application of law—here, one or more regulations—to a particular set of facts—in this case, one or more disabilities affecting appellant. *Butts v. Brown,* 5 Vet.App. 532, 538 (1993) (en banc). In view of their specialized skills in identifying and evaluating the exact medical nature of a particular condition, the VA's and the BVA's application of a DC to a particular condition is entitled to deference and we may set aside the Board's selection of a DC in a particular case only if such selection is found to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 538–39 (quoting 38 U.S.C.A. § 7261(a)(3)(A)). While our scope of review under the "arbitrary and capricious" standard is narrow and we cannot substitute our judgment for that of the BVA, the BVA is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Marlow v. Brown,* 5 Vet.App. 146, 151 (1993) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). Therefore, while we are not statutorily authorized to directly review the Schedule, 38 U.S.C.A. § 502 (West 1991); *see Butts,* 5 Vet.App. at 539 (citing *Hood v. Brown,* 4 Vet.App. 301, 304 (1993)), we may review the BVA's or VA's application of that Schedule to assure that any terms used in a particular rating are capable of validation and that adequate reasons or bases are provided to support any decisions under the Schedule. *Id.; see also Hood,* 4 Vet.App. at 304; 38 U.S.C.A. § 7104(d)(1); *Gilbert v. Derwinski,* 1 Vet.App. 49, 56–57 (1990) (BVA required to base its decisions on all evidence and material of record, and to provide an adequate statement of its reasons or bases for its findings and conclusions on all material issues of fact or law.)

## III. APPLICATION OF LAW TO FACTS

■ As noted in Part I, *supra,* this case does not come to this Court in a vacuum. The Court has of record the September 22, 1992, letter from the Office of the Chairman denying appellant's motion for reconsideration, as well as the Chairman's rescinded Memorandum No. 01–92–23, each of which reports that two diagnostic codes in the Schedule, DC 5293 and 8521, have been applied inconsistently by the BVA when evaluating claims based on IDS with secondary foot drop. This admitted inconsistency raises the question of disparate treatment, a question which is not resolved by the reasons or bases provided by the Board in support of its decision.

The BVA failed to articulate a satisfactory statement of reasons or bases for its rating action to include a rational connection between the facts found and the choice made, and accordingly, it is impossible for this Court to determine why appellant in this particular case, as opposed to other veterans with claims of IDS with secondary foot drop, was not rated for his foot drop separately under DC 8521. In support of its decision, the BVA appears to have relied on the descriptive language in the criteria for a 60% rating under IDS, i.e., "or other neurological findings appropriate to site of the diseased disc," for the proposition that a 60% rating for IDS fully compensates the veteran for the maximum amount of resulting peroneal nerve damage resulting from such IDS and, therefore, that a veteran is not entitled to a separate rating for such damage. The BVA, however, has made no specific factual finding that a separate rating under DC 8521 would violate the general prohibition against pyramiding. The BVA also has pointed to no express rule prohibiting separate ratings for appellant's IDS and his secondary neurological defects. Further, it is unclear from the BVA decision, or for that matter from the

Schedule upon which the BVA must rely in rendering that decision, which functional disabilities are compensated for as part of a 60% rating for IDS. Not only does the BVA decision fail to indicate whether the 60% rating adequately compensates appellant for the limitation of motion imposed by the secondary peroneal nerve defects, but it also fails to indicate whether that rating takes into account any accompanying limitation of lumbar motion or osteoarthritis and whether it accounts for differing gradations of neurological disability. Under the BVA's analysis in its decision, it appears that a veteran with IDS and less than complete paralysis of the common peroneal nerve would receive the same schedular disability rating as one with IDS and complete paralysis of the common peroneal nerve.

■ In attempting to justify its decision, the BVA notes that the separate evaluation of appellant's neurological defects may be complicated because those residuals may be related to his non-service-connected disabilities. The potential difficulty in evaluating appellant's neurological residuals, however, cannot properly be the basis for depriving appellant of a proper disability rating.

The Court finds itself unable to determine whether appellant's claim was denied because he was not entitled to an additional separate rating or because he was assigned, by the luck of the draw, to a panel of the majority view. Since it is impossible at this time for the Court to determine whether the BVA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a remand is warranted. On remand, "[t]he Court expects that the BVA will reexamine the evidence of record, seek any other evidence the Board feels is necessary, and issue a timely, well-supported decision in this case" addressing all of the issues raised in this decision. *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991). Moreover, if the circumstances warrant, the BVA is authorized and obligated to remand the claim to the regional office for further development. *See* 38 C.F.R. § 19.9 (1993); *Littke v. Derwinski*, 1 Vet.App. 90 (1990).

## IV. CONCLUSION

Upon consideration of the record and the filings of the parties, the BVA's March 16, 1992, decision is VACATED and this matter is REMANDED for further proceedings consistent with this opinion.