T.C. Memo. 2000-123


UNITED STATES TAX COURT


LAURENCE L. AND PATRICIA JACOBS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JAMES W. AND JANICE A. GEIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 18259-98, 1099-99.[1]   Filed April 10, 2000.


Laurence L. Jacobs, Patricia Jacobs, James W. Geis, and Janice A. Geis, pro sese.

Jordan S. Musen and Michael A. Skeen, for respondent.


MEMORANDUM OPINION


WELLS, Judge:  Respondent determined that petitioners are

---

[1]   These cases (hereinafter referred to as case) were consolidated for trial, briefing, and opinion.

not entitled to an abatement of interest pursuant to section

6404(e)[2] relating to their 1983 taxable years.  Petitioners meet

the net worth limitations of section 7430(c)(4)(A)(ii).

The only issue for decision is whether respondent's refusal

to abate interest for the period of time between April 1, 1985,

and July 8, 1996, was an abuse of discretion.

Background

Some of the facts have been stipulated for trial pursuant to

Rule 91.  The parties' stipulations are incorporated into this

Memorandum Opinion by reference and, accordingly, are found as

facts in the instant case.  When petitioner Laurence Jacobs filed

his petition, he resided in Newport Beach, California.  When

petitioner Patricia Jacobs filed her petition, she resided in

Huntington Beach, California.  When petitioners James and Janice

Geis filed their petition, they resided in Mission Viejo,

California.

Petitioners are limited partners in Tummies Ltd. Partnership

(TLP).[3]  TLP is a limited partnership subject to the provisions

---

[2]    Unless otherwise indicated, all section references are to
the Internal Revenue Code as amended, and all Rule references are
to the Tax Court Rules of Practice and Procedure.

[3]    Tummies Ltd. Partnership (TLP) was formed by brothers John
and William Knoke in December 1983 for the purpose of developing
a group of characters, a playboard, and an interactive record
known as the "interactor", all of which are collectively known as
the "Tummies".  The partnership's promoters hoped that the
cartoon characters would be licensed for use in children's
(continued...)

of sections 6221-6234.  In May 1984, respondent selected TLP's 1983 partnership return for examination.  The principal issue during the examination was the deductibility of research and development (R&D) costs of $1,885,500 for 1983.

April 1, 1985, Through August 1987

On April 1, 1985, respondent mailed notices of beginning administrative proceedings to the individual limited partners of TLP.  This was the first time that respondent notified the limited partners in writing that the partnership return for 1983 was under examination.  The first revenue agent to work on the examination of TLP's 1983 return was Jean Dosil.  Agent Dosil began gathering research materials and analyzing the R&D issue.  Later, Agent Dosil was reassigned to respondent's Appeals Office, and by January 1986, the partnership examination was reassigned to Revenue Agent Fred McBrien.

Throughout his examination, Agent McBrien dealt with two representatives of TLP, its tax matters partner, John Knoke,[4] and its attorney, William Reising.  By September 24, 1986, TLP and respondent executed a Form 872-O, signed by the tax matters partner and Mr. Reising, which extended the period of limitations

---

[3](...continued)
cartoon programs and sold as a three-dimensional toy and game with a record that could feed off the popularity and recognition of the cartoon program.

[4]     John Knoke is the general partner of TLP and has chief decision-making responsibility and control over its operation.

for TLP's 1983 year indefinitely.  The extension of the period of limitations could have been terminated if either TLP's tax matters partner or its attorney had submitted a Form 872-N, but none was ever submitted.[5]  The Form 872-O was not terminated until notices of final partnership administrative adjustment (FPAA) were issued to the tax matters partner and to the limited partners.

During the examination, Agent McBrien experienced difficulties obtaining from the tax matters partner various legal and business documents relating to the R&D expenses.  Agent McBrien also had to make a number of efforts to locate and compile the limited partners' Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc.  The Schedules K-1 were needed to determine the percentage of each limited partner's allocable loss.  Agent McBrien made at least two trips to the tax matters partner's house in San Clemente, California, to secure the forms. It was important to obtain the Schedules K-1 from the tax matters partner instead of the Fresno Service Center (FSC) in order to expedite the examination.  Obtaining the forms from Fresno could take up to three times longer than obtaining copies from the tax matters partner.  By the close of the examination, Agent McBrien

---

[5]    Had a Form 872-N been submitted, respondent would have been required to issue a notice of final partnership administrative adjustment within 90 days of receiving the Form 872-N.

had all the Schedules K-1 for tax year 1983 but was never able to procure all of the Schedules K-1 for 1984.[6]

During the period April 1, 1985, through August 1987, there was never a time when no work was being done on the TLP file. Agent McBrien never received any complaints from any of the limited partners or TLP's representatives regarding the speed of the examination. At the conclusion of his examination, Agent McBrien determined that all R&D losses for tax years 1983 and 1984 should be disallowed, but that no penalties should be determined. With an attached cover letter dated March 24, 1987, Agent McBrien sent Mr. Reising a tentative position paper proposing to disallow the R&D expenses claimed for 1983. Agent McBrien then contacted the tax matters partner and Mr. Reising about setting a time for a closing conference. The date of the closing conference is unknown. By August or September 1987, Agent McBrien finished his examination of TLP. Complete agreement was not reached and the case was ultimately sent to Appeals to resolve the remaining disputed issues.

---

[6]   Obtaining the 1984 Schedules K-1 was necessary because the TLP audit involved a series of transactions straddling the 1983 and 1984 taxable years. It was not prudent to conduct a separate audit for each of those 2 taxable years because the series of transactions was part of the larger issue of whether the R&D expenses were deductible.

September 1987 Through November 17, 1991

Sometime after his last meeting with TLP's representatives, during August 1987, but before April 1989, Agent McBrien forwarded the TLP file to respondent's Quality Review branch to be reviewed for compliance with internal procedures. The exact date, or even the approximate date, that Quality Review received the TLP file is unknown.

Because TLP is governed by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, Quality Review had to perform special compliance checks. Michael Lester was assigned to the Quality Review branch during 1989. As a TEFRA coordinator, Agent Lester was responsible for reviewing TEFRA cases to make sure that the administrative steps had been followed properly. He was also responsible for preparing the appropriate 60-day or 150-day letter. Agent Lester did not remember the TLP case, nor did he recall when his unit received the case. Agent Lester remembered keeping current with his caseload and did not recall a backlog of cases in Quality Review when he was there.

During April 1989, Quality Review returned the TLP case to Agent McBrien's examination group because the case file did not have any of the Schedules K-1 needed for processing. Quality Review also asked Agent McBrien to look into other substantive issues and to reexamine whether it was appropriate to impose

penalties. Agent McBrien testified that the examination group forwarded the Schedules K-1 to Quality Review, and that his group no longer had possession of the forms after the case was sent to Quality Review. During September 1989, the examination group finished its work and returned the file to Quality Review. The record is silent as to what happened with the TLP case from September 1989, through November 17, 1991.

November 18, 1991, Through July 8, 1996

On November 18, 1991, the FSC issued the limited partners a 60-day letter for the 1983 tax year proposing to disallow the R&D losses based upon Agent McBrien's findings. By letter dated January 15, 1992, TLP's tax matters partner requested an appeal of the 60-day letter.

On March 19, 1992, the case was assigned to Appeals Officer Beth Thurston to resolve the disputed issues. She checked the case into her inventory, verified that the period of limitations had not expired and that there were sufficient documents in the file, and reviewed the issues to see if they were sufficiently developed to be considered by Appeals.

TLP's first representative during the Appeals process was Mr. Reising. Appeals Officer Thurston and Mr. Reising discussed the issues of the case during a telephone conference on June 9, 1992. During December 1992, Appeals Officer Thurston mailed an appointment letter to Mr. Reising. Mr. Reising was involved with

an unrelated, ongoing trial and, consequently, was not able to meet with Appeals Officer Thurston until January 1993. Appeals Officer Thurston asked Mr. Reising to submit a position paper at the January meeting.

Mr. Reising did not submit a position paper at the January meeting and was prepared to discuss only his belief that the period of limitations on assessment for tax years 1983 and 1984 had expired. Appeals Officer Thurston replied by showing Mr. Reising the Form 870-O with his signature. Because Mr. Reising was not prepared to discuss the substantive R&D issue, Appeals Officer Thurston asked him to submit the position paper by March 1993. On March 8, 1993, Mr. Reising called Appeals Officer Thurston to inform her that he would have the position paper completed that week. On March 19, 1993, during a telephone call, Mr. Reising told Appeals Officer Thurston that he was still working on the position paper. During May 1993, Appeals Officer Thurston finally received Mr. Reising's position paper, dated March 11, 1993.

Shortly after receiving the position paper, Appeals Officer Thurston was sent to training for approximately 6 weeks. The TLP case was not reassigned to another Appeals Officer while she was in training. Appeals Officer Thurston was not able, because of the training sessions, to respond to Mr. Reising's position paper

until August 12, 1993, when she wrote a letter to Mr. Reising addressing his arguments.

After trading several telephone messages, on September 10, 1993, and again on September 16, 1993, Appeals Officer Thurston and Mr. Reising spoke by telephone. By that time, discussions had switched from the substance of the R&D issue to how individual limited partners would be affected by the R&D loss disallowance. Specifically, Mr. Reising was concerned about the treatment of limited partners who sold their partnership interests and reported gains after 1983 and 1984. After the September 1993 telephone discussions, Appeals Officer Thurston and Janet Spaulding, an Appeals TEFRA coordinator, worked on formulating a settlement offer for TLP. Appeals Officer Thurston attempted to accommodate Mr. Reising's request that separate settlements be undertaken for the individual limited partners who sold their interests; however, she and Appeals Coordinator Spaulding later determined that separate settlements for those partners would be impractical.

From September 17, 1993, through April 21, 1994, Appeals Officer Thurston was still working with Appeals Coordinator Spaulding to see if they could address the concerns of limited partners who wanted a separately computed settlement. They discussed the matter with their supervisors but did not prepare any specific forms or documents. On April 22, 1994, Appeals

Officer Thurston left a message for Mr. Reising.  Mr. Reising failed to return her call, and on May 5, 1994, Appeals Officer Thurston sent a fax to Mr. Reising's office.  The fax stated in pertinent part that "Due to more pressing priorities, I have let this matter sit on the back burner.  However, now that we have essentially agreed upon a settlement, I am sure you are as interested in concluding the matter as I am."  Later that day, Mr. Reising called Appeals Officer Thurston to let her know that he was no longer representing TLP and that William Knoke was now TLP's representative.

Appeals Officer Thurston called Mr. Knoke requesting that he forward his power of attorney.  By letter dated May 26, 1994, Mr. Knoke forwarded the power of attorney and a settlement proposal. By letter dated August 11, 1994, Appeals Officer Thurston responded to Mr. Knoke's proposal, setting forth additional terms and asking for clarification on a few points.  On August 29, 1994, Mr. Knoke sent Appeals Officer Thurston a letter which stated:  "I am in receipt of your letter of August 11, 1994.  I have spoken with the General Partner regarding your letter.  We will agree to all of the terms that you outlined in your letter. Please proceed with finalizing this case."

After receiving Mr. Knoke's August 29, 1994, letter, Appeals Officer Thurston began preparing the paperwork necessary to move the settlement forward.  From February 1995 until sometime in

April 1995, Appeals Officer Thurston, aided by Appeals Coordinator Spaulding, worked on an Appeals case memorandum and a TEFRA settlement offer package. The package included completing Form 870-P(AD), Form 5402, Appeals settlement memorandum, Form 4605-A, and Form 886-Z(C). Completing the settlement package was time consuming. The amount of time it took to complete the settlement package was compounded by problems with the networked computer system and difficulties obtaining computer disks from the examination group that were necessary to complete the settlement package. Appeals Officer Thurston had to also organize Appeals personnel to perform computations for each of the 125 to 135 limited partners.

On May 2, 1995, Appeals Officer Thurston spoke with Mr. Knoke concerning how the settlement would work for those limited partners who sold their partnership interests. Between May and June 1995, Appeals Officer Thurston completed the TEFRA settlement package. On June 30, 1995, Appeals Officer Thurston submitted the case to her manager, Janet Cole, for approval. On July 13, 1995, the Appeals Office forwarded a settlement package to the FSC. The transmittal letter instructed the FSC to issue letters and agreement forms to the TLP partners.

On August 14, 1995, the FSC mailed settlement letters to the limited partners. After issuance of the settlement letters, the Internal Revenue Service (IRS) waited for responses from the

individual limited partners. If an individual limited partner chose to accept the settlement, the settlement letter would go to the Ogden Service Center (OSC), which in turn, would send the letter to Salt Lake City for an associate chief to sign. Upon approval, the letter would then be returned to the OSC for processing and a copy would be sent to the Appeals Office. During May 1996, Appeals Officer Thurston worked on preparing FPAA's for those limited partners who chose not to accept the settlement offer. On June 6, 1996, Appeals Officer Thurston wrote an attachment to the FPAA package providing instruction to the OSC on how to process the settlement offers.

On June 10, 1996, Appeals Officer Thurston and Appeals Office Manager Cole signed and dated a Form 5402, Appeals Transmittal Memorandum and Supporting Statement, documenting the Office of Appeals' settlement offer and acknowledging that the offer had been made to the individual partners of TLP. The Form 5402 recommended issuance of an FPAA for each limited partner who had not accepted the settlement by returning a signed Form 870-P(AD).

On June 13, 1996, respondent's Appeals Office record section mailed the FPAA package to the OSC.[7]

---

[7] During September 1995, all of the Fresno Service Center work related to TEFRA partnerships, including TLP, was transferred to the Ogden Service Center.

On July 8, 1996, respondent mailed an FPAA to petitioners James and Janice Geis.

A Form 870-P(AD) was mailed to petitioners Laurence and Patricia Jacobs on August 14, 1995, but they did not sign the settlement letter until June 30, 1996. The OSC received the Jacobses' settlement letter on July 11, 1996.

As of the date of the Geises' letter finally determining that interest would not be abated, the Geises' total interest liability was $21,298.31 and their assessed interest was $734.77 for tax year 1983. The Geises have not made any payments of interest. As of the date of the Jacobses' letter finally determining that interest would not be abated, the Jacobses' total interest liability was $17,629.17 for tax year 1983. The Jacobses made the following payments of interest which relate to the TLP issue: $10,000 on or around August 6, 1998; $9,231.84 on or around August 31, 1998; and $300.91 on or around October 7, 1998.

Discussion

Pursuant to section 6404(e)(1), as it applies to the instant case,[8] the Commissioner may abate part or all of an

---

[8] Congress amended sec. 6404(e) during 1996 to permit abatement of interest for any "unreasonable" error and delay in performing a ministerial "or managerial" act. Taxpayer Bill of Rights 2 (TBOR 2), Pub. L. 104-168, sec. 301(a)(1) and (2), 110 Stat. 1452, 1457 (1996). That amendment, however, applies only to tax years beginning after July 30, 1996, and, therefore, does
(continued...)

assessment of interest on any deficiency or payment of tax (described in section 6212(a)) if either:  (1) Such deficiency was attributable to an error or delay by a Service official in performing a ministerial act or (2) any error or delay in such payment is attributable to a Service official's being erroneous or dilatory in performing a ministerial act.  See sec. 6404(e)(1).  A taxpayer can obtain relief only if no significant aspect of the error or delay can be attributed to the taxpayer involved.  See id.  Section 6404(e) is not intended to be routinely used to avoid payment of interest; rather, Congress intended abatement of interest only where failure to do so "would be widely perceived as grossly unfair."  H. Rept. 99-426, at 844 (1985), 1986-3 C.B. (Vol. 2), 1, 844; S. Rept. 99-313, at 208 (1985), 1986-3 C.B. (Vol. 3), 1, 208.  The Tax Court has jurisdiction to review for abuse of discretion the Commissioner's failure to abate interest and may order an abatement.  See sec. 6404(i).

The term "ministerial act" means a procedural or mechanical act that does not involve the exercise of judgment or discretion and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place.  Sec. 301.6404-2T(b)(1), Temporary

---

8(...continued)
not apply to the instant case.  See TBOR 2 sec. 301(c), 110 Stat. 1457.

Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).[9]  A decision concerning the proper application of Federal tax law is not a ministerial act.  See id.  We proceed to consider whether respondent's refusal to abate interest in the instant case was an abuse of discretion.  Our analysis is segmented into the relevant time periods.

April 1, 1985, Through August 1987

April 1, 1985, the date respondent mailed notices of beginning administrative proceedings to the individual limited partners of TLP, is the point at which respondent first contacted petitioners in writing with respect to the deficiencies. Consequently, April 1, 1985, begins the period that may be taken into account, pursuant to section 6404(e), in deciding whether interest may be abated.  At trial, Agent McBrien explained that between April 1, 1985, and September 1987, Agents Dosil and McBrien spent most of their time considering whether to allow the R&D expense and whether to determine penalties.  He also testified that work on the TLP file proceeded at a steady pace as

_____

[9]    The final regulations under sec. 6404 were issued on Dec. 18, 1998.  The final regulations generally apply to interest accruing on deficiencies or payments of tax described in sec. 6212(a) for tax years beginning after July 30, 1996.  See sec. 301.6404-2(d)(1), Proced. & Admin. Regs.  Accordingly, the final regulations are inapplicable to the instant case, and sec. 301.6404-2T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987), effective for taxable years beginning after Dec. 31, 1978, but before July 30, 1996, does apply.  See sec. 301.6404-2T(c), Temporary Proced. & Admin. Regs., supra.

they spent time researching and interpreting the proper application of the law to the TLP case. Decisions concerning the proper application of Federal tax law are not ministerial acts. See sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., supra. Because the actions of Agents Dosil and McBrien in researching and interpreting the proper application of the law are not ministerial acts, respondent's refusal to abate interest that accrued while they were taking those actions was not an abuse of discretion.

Furthermore, we note the failure of the tax matters partner and TLP's attorney timely to comply with respondent's requests for TLP business and legal documents and the limited partners' Schedules K-1. Petitioners argue that, because respondent possessed all of the necessary Schedules K-1, the noncompliant acts of the tax matters partner should not be the focus of the inquiry. The reason Agent McBrien asked for the K-1s, however, was to expedite the examination process. The failure to obtain all of the Schedules K-1 for TLP and the time it took to obtain the other business and legal documents extended the time necessary to complete the audit and contributed significantly to any delay that occurred while the case was in examination. Accordingly, for the period April 1, 1985, through August 1987, we hold that it was not an abuse of discretion for respondent to refuse to abate interest.

September 1987 Through November 17, 1991

The evidentiary record for the period September 1987 through November 17, 1991, is scant. Sometime after Agent McBrien's last meeting with TLP representatives during August 1987, but before April 1989, Agent McBrien forwarded the TLP case to respondent's Quality Review branch. The exact date, or even the approximate date, that he forwarded the case to Quality Review is unknown. Because Agent McBrien concluded his last meeting with TLP's tax matters partner and its attorney during August 1987, it is reasonable to infer that the TLP case was not forwarded to Quality Review any earlier than September 1, 1987. When Agent Lester was asked at trial about the handling of the TLP case while it was in Quality Review, Agent Lester was not able to recall the case at all. The first evidence in the record indicating that the TLP case was being considered by Quality Review was when Quality Review returned the case, during April 1989, to Agent McBrien's examination group because of deficiencies in the case file and because Quality Review wanted him to reexamine his recommendation not to determine penalties. Agent McBrien's examination group eventually resubmitted the TLP case to Quality Review during September 1989. Nothing further about that period is contained in the record.

Of particular relevance to the instant case is section 301.6404-2T(b)(2), Example (3), Temporary Proced. & Admin. Regs., supra, which provides the following:

> A taxpayer invested in a tax shelter and reported a loss from the tax shelter on the taxpayer's income tax return. Internal Revenue Service personnel conducted an extensive examination of the tax shelter, and the processing of the taxpayer's case was delayed during such examination. Because the period of limitations on assessment was about to expire, the taxpayer executed a consent to extend the period of limitations. The time required to process the taxpayer's case was not a result of a delay in performing a ministerial act; consequently, interest attributable to this period cannot be abated * * *.

Example 3 was neither incorporated into the final regulations nor cited by respondent in the instant case, although it appears to be applicable to the instant case.[10]

TLP's tax matters partner and its attorney executed a Form 872-O extending the period of limitations indefinitely. Although the Form 872-O was never revoked or terminated for the duration of the examination, review, and appeal of the TLP case, we do not interpret Example 3 so broadly as to conclude that the parties' extension of the period of limitations means that respondent could not commit an error or delay in performing a ministerial act during that period. We conclude that, even where an extension of the period of limitations is granted, there may be instances where an error or delay by an officer or employee of the IRS in performing a ministerial act may present a

---

[10] See supra note 9.

circumstance where the Commissioner's determination not to abate interest is an abuse of discretion.

When reviewing the Commissioner's determination pursuant to section 6404, our inquiry is a factual one, and we proceed on a case-by-case basis. See Boyd v. Commissioner, T.C. Memo. 2000-16. We employ an abuse of discretion standard in reviewing the Commissioner's determination not to abate interest, and we give the Commissioner's determination due deference. See Woodral v. Commissioner, 112 T.C. 19, 22 (1999). The Commissioner, however, does not have complete latitude. The Court will direct the Commissioner to abate interest if the Commissioner's exercise of discretion was arbitrary, capricious, or without sound basis in fact or law. Indeed, the Court held that the Commissioner's discretion was abused in Kincaid v. Commissioner, T.C. Memo. 1999-419, and Douponce v. Commissioner, T.C. Memo. 1999-398.

The final determination letters in the instant case merely conclude: "We did not find any errors or delays that merit abatement of interest in our review of available records and other information for the period from 4/15/84 to 11/15/1997." Other than such cursory language, there is nothing in either the final determination letters or the testimony and other evidence that respondent offered at trial describing (1) what respondent inquired into for the period September 1987 through November 17, 1991, (2) the results of that inquiry, and (3) the basis for

respondent's determination not to abate interest. There may simply be no record of what happened after the case was sent to Quality Review and no witness who can explain what happened. On the other hand, it is possible that respondent performed an inquiry yielding useful information but failed to offer that information to petitioners or to the Court. In any event, except for the period April 4, 1989, through September 30, 1989, the period of time the TLP case was back with Agent McBrien's examination group, we can only speculate, as respondent does, as to what happened with the TLP file during the period from September 1, 1987, through November 17, 1991.

Because section 6404(e) provides for this Court to review for abuse of discretion the Commissioner's determination as to whether interest will be abated, the Court must decide how to proceed where the basis for the Commissioner's determination has not been clearly explained either in the final determination letters or at trial. In Motor Vehicle Manufacturers Association of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 49 (1983), the Supreme Court stated that an agency must cogently explain why it has exercised its discretion in a given manner. Similarly, in National Treasury Employees Union v. Federal Labor Relations Auth., 802 F.2d 843, 845 (6th Cir. 1986) (citing Ross Express, Inc. v. United States, 529 F.2d 679, 682 (1st Cir. 1976)), the Court of Appeals for the Sixth Circuit

stated that "The * * * [agency's] decision must be sufficiently clear so that a court is not required to speculate as to its basis."  See also Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984) (quoting Wong Wing Hang v. INS, 360 F.2d 715, 719 (2d Cir. 1966) ("[A]gency action would be an abuse of discretion 'if it were made without a rational explanation.'")).

We are satisfied from the evidence adduced at trial that during the period April 4, 1989, through September 30, 1989, i.e., while the case was back with Agent McBrien's examination group, respondent's actions were not ministerial.  However, as to the period September 1, 1987, through November 17, 1991 (excepting the period April 4, 1989, through September 30, 1989), respondent has failed to explain the rationale for respondent's determination not to abate interest.

The Commissioner is in the best position to know what actions were taken by IRS officers and employees during the period for which petitioners' abatement request was made and during any subsequent inquiry based upon that request.  If we were to uphold the Commissioner's determination not to abate interest where the Commissioner has not clearly explained the basis for the exercise of that discretion, we would be condoning a review framework that would encourage the Commissioner to provide as little information as possible about the handling of cases during the period of the abatement request and about the

inquiry in response to the request. We do not believe that Congress had that kind of review process in mind when it enacted section 6404 and provided this Court jurisdiction in section 6404(i) to review, for abuse of discretion, the Commissioner's determination not to abate interest. Accordingly, because respondent has failed to explain clearly the basis for respondent's refusal to abate interest for the period September 1, 1987, through April 3, 1989, and the period November 1, 1989, through November 17, 1991, we hold that it was an abuse of discretion for respondent to refuse to abate interest for that period. For the period April 4, 1989, through September 30, 1989, we uphold respondent's final determination not to abate interest.

## November 18, 1991, Through July 8, 1996

From November 18, 1991, through the mid-May 1993, there were no ministerial acts performed by respondent. On March 19, 1992, Appeals Officer Thurston began her work resolving the disputed issues. Much of her early work with the TLP case depended upon the cooperation of TLP's representatives in scheduling meetings and phone conferences as well as providing her with a paper outlining TLP's position on the substantive issues. Most of the delay that occurred during that period of time was due to delay caused by Mr. Reising. His tardiness in completing TLP's position paper was the cause of significant delay. Accordingly,

we uphold respondent's final determination not to abate interest from November 18, 1991, through mid-May 1993. By the time Appeals Officer Thurston received TLP's position paper, she was set to go to training for approximately 6 weeks--from approximately mid-May through early July 1993. The case was not reassigned to another agent while Appeals Officer Thurston was in training, and no work was completed on the TLP case. Pursuant to section 301.6404-2T(b), Example (4), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987), however, the decision not to reassign the case while Appeals Officer Thurston was in training was not a ministerial act. Accordingly, from mid-May through early July 1993, the period of time Appeals Officer Thurston was in training, we uphold respondent's final determination not to abate interest.

When Appeals Officer Thurston returned from training she finished her response to Mr. Reising's position paper. By that time, the focus of the appeal switched to how the individual partners would be treated. Discussions regarding the treatment of the individual limited partners continued until September 16, 1993, eventually ending with the understanding that there would not be individual settlements for each of the limited partners. Because there were no delays caused by any ministerial acts of respondent's officers or employees from early July through

September 16, 1993, we uphold respondent's final determination not to abate interest for such period.

It is apparent from Appeals Officer Thurston's April 22, 1994, facsimile to Mr. Reising, stating she had put the TLP case "on the back burner", that she was working on non-TLP matters from September 17, 1993, through April 21, 1994.  Appeals Officer Thurston was able to work on more pressing matters because the tax matters partner and TLP's attorney executed a Form 872-O extending the period of limitations indefinitely.  Though not precisely on point, section 301.6404-2T(b), Example (5), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987), implies that Appeals Officer Thurston's decision to order her work affairs based on caseload priorities is not a ministerial act.  Consequently, we uphold respondent's final determination not to abate interest from September 17, 1993, through April 21, 1994.

From April 22, 1994, forward, we are satisfied that respondent was working steadily on the TLP case to bring the matter to a close.  Between April 22 and August 29, 1994, Appeals Officer Thurston spent her time clarifying the settlement with TLP's new representative, William Knoke.  After August 29, 1994, Appeals Officer Thurston prepared the paperwork and performed other tasks necessary to bring the settlement to a close.  After the settlement letters (containing Forms 870-P(AD)) were sent to

the limited partners on August 14, 1995, it was necessary to wait several months to see how many partners would accept the offer before respondent could send FPAA's to the limited partners who rejected the settlement.  At that point, after the settlement letters were mailed, the speed at which the matter was to be closed was up to the partners.  The Geises never signed a Form 870-P(AD), and respondent did not receive the Jacobses' Form 870-P(AD) until July 11, 1996.  From May until July 1996, when respondent sent the FPAA's to petitioners, Appeals Officer Thurston prepared the documents to be included in the FPAA package.  On the basis of the foregoing, we conclude that there were no errors or delays in the performance of ministerial acts by respondent's officers or employees during that period. Accordingly, we uphold respondent's final determination not to abate interest from April 22, 1994, through July 8, 1996.

To reflect the foregoing,

<u>Decisions will be entered abating interest for the period of time stated herein</u>.