**ROBERTA B., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–1871C.**

United States Court of Federal Claims.

July 7, 2006.

---

W. Randolph Teslik and C. William Frick, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, for plaintiff.

Andrew P. Averbach, with whom were Assistant Attorney General Peter D. Keisler, Director David M. Cohen, and Assistant Director Patricia M. McCarthy, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

Plaintiff, a retired employee of the Central Intelligence Agency (the "CIA" or "agency"), seeks to recover $3,995 in wages previously withheld from her salary in repayment of relocation expenses incurred in connection with her assignment to a foreign duty station, as well as a declaration that the CIA may not collect an additional $37,000 in relocation expenses it claims it is still owed. The case is now before the court on cross-motions for summary judgment. Based on the November 15, 2005, oral argument and on supplemental briefing completed in March of this year, we now grant defendant's motion for summary judgment and deny plaintiff's cross-motion.

## FACTS

Plaintiff, an employee with more than twenty years' experience working for the CIA, applied and was accepted for a two-year tour of duty in the CIA's East Asian Division beginning on April 24, 1997. Upon her arrival at her duty station, plaintiff was assigned housing outside the United States compound but deemed it unacceptable based on its location and on security concerns.[1] Plaintiff immediately notified the Chief of Base ("COB")—the highest-ranking CIA official in the post city and plaintiff's supervisor—as well as the State Department Housing Officer of her objections and was consequently given agency transportation to a nearby hotel. Plaintiff stayed at the hotel for two nights at the government's expense before moving to a second hotel (also paid for by the government) located closer to the United States Consulate.

In addition to notifying the COB and the State Department Housing Officer of her concerns about her initial housing assignment, plaintiff wrote a memorandum to the Inter–Agency Housing Board detailing the house's deficiencies and requesting reassignment. In response, the Housing Board agreed to revise its housing policy to provide incoming employees with a choice of available/approved housing, but alerted plaintiff that there were no security-approved houses then available from which she could choose.

With the assistance of a local realtor assigned by the State Department Housing Officer, plaintiff and her husband spent the next several weeks inspecting other housing possibilities. Of the ten properties considered, all but one, in plaintiff's view, failed to satisfy the State Department's standards for security and habitability. The exception—a house that fell within the permitted housing dollar allowance—exceeded the applicable square-footage limit and was thus deemed by the agency to be unacceptable.

Having failed to locate what she considered to be adequate housing and having been told by her realtor that she was unlikely to find housing that fell within the agency's square-footage limitation and housing dollar allowance, plaintiff requested authorization to return to the United States prior to the

---

1. Plaintiff additionally objected to her original housing assignment on the grounds that the property had been vacant for four months, was located next to a junk yard on an essentially abandoned street, was not accessible by public transportation, was infested with spider webs and snake skin, and did not have a working security system or meet other security requirements.

completion of her tour of duty. The CIA granted her request but advised that her return would not be considered at the convenience of the government and, therefore, pursuant to the Service Abroad Agreement plaintiff had been required to sign, plaintiff would be responsible for her own relocation expenses.

Plaintiff returned to the United States on May 22, 1997. Thereafter, she requested a review of the CIA's decision that her departure from the post city was not at the convenience of the government, a determination that was upheld first by the CIA's Director of Human Resources on August 6, 1997, and later by the Deputy Director for Administration on July 20, 1998. The CIA accordingly notified plaintiff by e-mail dated February 11, 1999, of its intention to recover $40,927 in relocation costs.

Plaintiff next sought and was granted a written review and oral hearing to challenge the assessed liability. In an August 30, 1999, report, the hearing officer concluded that "[d]uring her time at post, the government continued to make good faith attempts to satisfy [plaintiff's] requirement for secure and comfortable housing commensurate with her rank, which was the only reason [plaintiff] cited at the time for her departure." Upon reviewing that report, the Director of Finance and Logistics issued a final decision on November 8, 1999, upholding the agency's determination.

Plaintiff appealed to the Administrator of the General Services Administration but was denied relief. In a decision dated August 3, 2001, the Administrator, acting through the General Services Administration Board of Contract Appeals, upheld the CIA's debt determination: "We deny the claim, as we conclude that the agency did not act arbitrarily or capriciously in deciding that claimant had failed to show sufficient cause under statute and regulation for release from conditions of her service abroad agreement." 2001–2 B.C.A. (CCH) ¶ 31,565.

Plaintiff filed suit in this court on August 6, 2003. In an August 20, 2004, decision denying defendant's motion to dismiss, we held that the agency's refusal to reimburse plaintiff under her Service Abroad Agreement was reviewable by this court under the standard set forth in the Foreign Affairs Manual ("FAM"), requiring the State Department to provide all employees with housing that is "comparable to what an employee would occupy in the Washington, DC Metropolitan Area, with adjustments for family size and locality abroad." *Roberta B. v. United States*, 61 Fed.Cl. 631, 636 (2004) (*quoting* 6 FAM § 721.1(a) (2003)). As to plaintiff's breach of contract claim, we noted that "[t]he failure to provide plaintiff with adequate housing" would be "an excusable condition for her non-performance [of the contract]" and that "[t]he agency's failure to acknowledge that condition, if proven true, would render the salary offset arbitrary." *Id.* at 637. We are now confronted with the question of whether the CIA's decision denying plaintiff reimbursement of her relocation expenses was arbitrary or capricious or, expressed in contract terms, whether the government breached the Service Abroad Agreement so as to relieve plaintiff of her obligations thereunder.

## DISCUSSION

### I.

Plaintiff's Service Abroad Agreement provided in relevant part:

If you terminate your permanent assignment outside the continental United States before you complete 12 month[s] of creditable service following the date of your arrival abroad, you will be required to reimburse the government for all expenses it incurs in the travel and transportation to your post of you, your dependents, your household and personal effects.... If, however, agency officials determine that your early departure is necessary for official reasons, or for personal reasons of significant interest to the government, they may waive the reimbursement of expenses already incurred, or authorize your return travel and transportation, whichever is applicable.

Plaintiff argues that the agency materially breached that agreement by failing to provide her with housing that was safe, secure, and habitable in compliance with agency

standards, that she gave the agency ample time to cure that breach and exhausted all reasonably available administrative avenues to enable the agency to do so, but that the breach ultimately relieved her of her obligations under the agreement. In light of these facts, plaintiff maintains that the agency's determination that she was herself in breach of the Service Abroad Agreement was arbitrary, capricious, and otherwise not in accordance with law.

In support of her position, plaintiff refers us to several sources that she maintains set forth the agency's standards for the provision of overseas housing, each of which, in plaintiff's view, the agency failed to satisfy.[2] Plaintiff begins her argument with the Foreign Affairs Manual ("FAM"), which, as set forth above, requires that all employees be provided with housing that is "comparable to what an employee would occupy in the Washington, DC Metropolitan Area, with adjustments for family size and locality abroad." 6 FAM § 721.1(a). Plaintiff next points to the 1991 American Consulate Housing Handbook as establishing a standard policy to "assign newly arrived personnel to permanent quarters at the earliest possible date."[3] Finally, plaintiff cites the Foreign Affairs Handbook ("FAH") which requires the agency to obtain the approval of the regional or post security officer before leasing or purchasing a home,

12 FAH–8 §§ H–142.4(a), 143.2(a) (2001), and to provide "all U.S. citizen direct-hire employees and their eligible family members at each U.S. diplomatic mission" an "equal level of protection," *id.* at § H–111(d). Preference under the FAH is to be given, plaintiff further notes, to "residences with a perimeter barrier, such as a wall or fence, which deters access to the property," *id.* at §§ H–142.4(c), 143.2(c), and to those houses whose entrances have a "substantial door" and a "RSO [Residential Security Office]-approved deadbolt-type lock," *id.* at §§ H–142.4(f), (h), whose windows are fitted with "[g]rilles deemed adequate for local conditions by the RSO," *id.* at §§ § H–143.2(g), and which possess "approved [alarm] devices to protect accessible windows and/or openings and doors," *id.* at § H143.2(i).[4]

Despite the agency's alleged failure to satisfy any of these requirements, plaintiff maintains that she worked diligently with the State Department's real estate agent, met repeatedly with government officials responsible for housing, inspected more than ten houses, petitioned the Housing Board, and waited approximately a month for the government to cure its initial breach. Plaintiff also contends that although she did not engage the process outlined in the FAM for the appeal of housing assignments, 6 FAM § 722.4–2,[5] she nevertheless exercised com-

---

**2.** In addition to the Foreign Affairs Manual and the Foreign Affairs Handbook, plaintiff asserts that the government violated an assortment of other provisions governing the stationing of United States personnel abroad, specifically "the Diplomatic Security Act, 22 U.S.C. § 4801 et. seq. (establishing State Department responsibility for government personnel assigned to consular posts); the National Security Act, 50 U.S.C. § 403–3 (protecting undercover officers from unauthorized disclosure); and Executive Order 12,333 (directing the Agency to protect the security of its employees)." None of these sources, however, provides a clear or meaningful standard against which to measure the reasonableness of the agency's conduct.

**3.** By its terms, the American Consulate Housing Handbook was designed to assist employees "in understanding [their] rights and responsibilities, as well as those of the Government, for [their] assigned Government housing." The handbook goes on to specify that "[t]he Consulate General will provide each U.S. Government employee ... with the best housing available at the time that is suitable and appropriate to the official and per-

sonal requirements of the employee and his/her family."

**4.** The obligation to provide such housing was particularly important, plaintiff argues, because the area to which she was assigned was a Type 3 post, which is described in the FAM as an assignment in which "[d]aily life is the most difficult [and][c]ultural and recreational facilities are scarce, travel is restricted, and the terrorist threat to personal security is very high." 6 FAM § 728.4–2(b)(3). As a result of that threat level, plaintiff claims that most houses had a high compound wall and security bars on the windows.

**5.** Section 722.4–2 of the FAM, titled "Appeals," provides:

An appeal is a formal request for a change of quarters that maintains that the assigned quarters are unsuitable for the assigned occupant. Employees who wish to appeal an IAHB [Inter–Agency Housing Board] housing assignment must submit the justification to the post

mon sense and took reasonable steps to remedy her situation in the absence of an official policy to standardize housing appeals.[6] Plaintiff thus maintains that while her actions in dealing with her housing assignment were reasonable, the government's were not.

In response, defendant claims that plaintiff's failure to complete the search process, in particular her refusal to look at a house made available to her prior to her departure, invalidates her claim.[7] Restatement (Second) of Contracts § 242 cmt. a (1981) (observing that, even in the event of a material breach, a breaching party will ordinarily be afforded the opportunity to cure before the non-breaching party's duties are discharged). Defendant additionally maintains that the government's provision of hotel accommodations during the duration of plaintiff's stay satisfied its obligations under the Service Abroad Agreement as acknowledged by the FAM.[8] Finally, defendant asserts that plaintiff's insistence on barred windows or on a walled or gated compound is a flawed interpretation of State Department policy and

represents an internal dispute over which this court has no jurisdiction.

## II.

We note at the outset that a number of factors make us extremely sympathetic to plaintiff's position. First, the record demonstrates that the agency failed to identify a pool of approved, safe, and secure housing from which plaintiff was able to choose, despite regulations that contemplated the provision of such a process and the subsequent implementation of such procedures after plaintiff's departure from the post city. In addition, we believe it likely, based both on the realtor's statements and on the fact that the agency had not adjusted the housing allowance in a seven-year period, that plaintiff would have had great difficulty finding housing that met the applicable agency standards. We are also mindful that plaintiff diligently pursued the housing search, consistently keeping the COB, the State Department Housing Officer, and the Housing Board apprised of her efforts. Finally, we

IAHB and the SRPM [Single Real Property Manager] for review. If not resolved, it will be submitted to the DCM [Deputy Chief of Mission] and/or COM [Chief of Mission] for a decision. If it is still not resolved at post, the employee may appeal directly to his or her parent agency or, if a State Department employee, to the appropriate regional bureau executive officer for review. Copies of such appeals will be provided the SRPM who will forward copies to the OBO [Overseas Buildings Operations] and the regional bureau. The parent agency, in consultation with OBO, will determine whether the issue warrants consideration by the Washington, DC IAHB.

6. Plaintiff additionally argues that pursuing such a process would have been futile because her supervisors had already indicated that they would not support her efforts and in fact directly discouraged her from doing so. Specifically, the Chief of Base and the State Department Housing Officer told plaintiff that exceptions to the square footage limitation were "rarely granted" and that the process was "time consuming." The COB additionally explained to plaintiff that he was unwilling to support her appeal to officials in Washington, DC, because he did not want to "rock the boat," thus leading plaintiff to conclude that she was not authorized to pursue further appeal. We read no significance into plaintiff's failure to appeal directly to Washington, DC, however, since we read the CIA's No-

vember 8, 1999, determination as a final agency action and do not understand defendant to be arguing that plaintiff failed to exhaust her administrative remedies. We thus see no jurisdictional defect in plaintiff's claim.

7. According to defendant, plaintiff admitted during the August 19, 1999, proceeding before the hearing officer that a house was made available to her for inspection prior to her departure but that she declined because she "just, at that time, wanted to leave." Defendant also notes that plaintiff, by her own testimony, "imagine[d] eventually [she] might have found [a house], but combined with the other problems, [she] left." Defendant argues that the "other problems" to which plaintiff referred—security and base management issues—are beyond the purview of this court.

8. Section 722.4–3 of the FAM, titled "Housing Options Pending Decision of Appeal," expressly recognizes such temporary housing as legitimate during the pendency of a housing appeal:

Until a decision is made on the matter, the employee may continue to receive temporary lodging allowance (TLA) benefits (not to exceed the maximum authorization set forth in the Standardized Regulations), may move into the assigned quarters, may occupy any unoccupied post transient housing, or may occupy alternate quarters at his or her own expense.

see no evidence that plaintiff at any time acted rashly or in haste.[9]

All of these considerations are ultimately the province of the agency, however, and not of this court. Our inquiry is instead limited to a determination of whether the CIA's November 8, 1999, final decision concluding that plaintiff had failed to pursue available avenues of relief before deciding to return to the United States should be rejected as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *Miller v. OPM,* 449 F.3d 1374, 1385 (Fed.Cir.2006) (Dyk, J., dissenting) (observing that an agency's determination of debt under the Debt Collection Act of 1982, 31 U.S.C. § 3716, is assumed reviewable under the APA) (citing *DRG Funding Corp. v. Sec'y of Hous. and Urban Dev.,* 76 F.3d 1212, 1214 (D.C.Cir.1996)); *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (observing that the "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency"); *Robinette v. Commissioner,* 439 F.3d 455, 459 (8th Cir.2006) (noting that "[i]t is a basic principle of administrative law that review of administrative decisions is 'ordinarily limited to consideration of the decision of the agency ... and of the evidence on which it was based.' "). We conclude that it should not.

As an initial matter, the record suggests that the agency considered the various aspects of plaintiff's situation on several occasions and made extensive written findings on which it based its decision. In a July 20, 1998, memorandum, for instance, the Deputy Director for Administration advised plaintiff as follows:

3. You stated in your appeal that the reasons for your early departure from [redacted] were your concerns about the housing you were offered and issues involving security, cover, and base management. After considerable review, I have been unable to find any corroborating information that would either substantiate the security, cover, and base management issues you raised, or that would justify a waiver of the reimbursement requirement.

4. The record indicates that your personal concerns about the housing options you were offered played a major part in your decision to leave [redacted] early. I am persuaded by the record in this case that your concerns and decisions with regard to the housing options available to you in [redacted] were matters of personal preference and, on that basis, you rejected otherwise acceptable housing offered to you.

5. Under these circumstances, I conclude that your early departure from [redacted] was neither for official reasons nor for personal reasons of significant interest to the government and, therefore, you breached your Service Abroad Agreement.

Similarly, in a September 13, 1999, memorandum to the Director of Finance and Logistics, titled "Findings from Written and Oral Review of Roberta [B's] Debt Case," the hearing officer identified the four objections plaintiff raised to the government's decision as follows:

(A) there was an unacceptable housing situation [redacted] (there were no available houses that fell within the housing allowance and square footage limitations established by the [redacted] which were acceptable to her from a livability and physical security standpoint),

(B) the physical office situation and Base [redacted] arrangements were exposing her to personal risk, (C) Base management would not take her concerns about housing and security seriously and, (D) Base management exercised a cavalier attitude towards the safety of its assets.

Basing her conclusion on a review of "all of the documents in the Case File, the information discussed at the oral hearing on 19 August 1999, the files in [Human Resource Management] Policy Group on approvals and

---

9. Indeed, plaintiff described her decision to curtail her assignment as "the most important decision of [her] 20+ year Agency career" because it rendered her ineligible for a retirement annuity under the CIA Retirement and Disability Plan.

disapprovals for short-of-tour cases, and the files in DA Center for Support Coordination on special approvals," the hearing officer went on to recommend that plaintiff be held liable for her relocation expenses, offering the following rationale for that determination:

- Ms. [B] signed and understood the Service Abroad Agreement.
- Prior to making her decision, Ms. [B] was aware of her potential liability to pay for [relocation] costs.
- Ms. [B] did not pursue any avenues available to her ... to communicate with the COB, the COS [Chief of Station], or Headquarters officials. At the hearing she stated that she considered the problems unresolvable to her satisfaction while in the field.
- Ms. [B] stated at the hearing that she did not experience or witness any event that clearly demonstrated she or her spouse were in imminent personal danger.
- At the hearing Ms. [B] did not provide any reason to fear discussing her concerns with the COB or COS or availing herself of the communication channels [available]. At the hearing she stated that she did not witness any actions that were illegal nor any attempts by management to cover up the situation at Post. She was not threatened or coerced but simply felt there was no point in raising her concerns with the COB or COS as she believed she would not be taken seriously.
- During her time at Post, the government continued to make good faith attempts to satisfy Ms. [B]'s requirement for secure and comfortable housing that were commensurate with her rank, which was the

only reason Ms. [B] cited at that time for her departure.
- The government was not afforded the opportunity to address or resolve Ms. [B]'s other concerns prior to her departure.

The hearing officer additionally noted that "[n]ot only was the case reviewed by [the Director of Human Resource Management], but a special appeal procedure through the [Deputy Director for Administration] was instituted for this case."

Finally, in the November 8, 1999, decision upholding the agency's earlier determination, the Director of Finance and Logistics advised plaintiff that "[t]he facts of your case, as detailed during the oral hearing, presented no extenuating circumstances sufficient to support your decision to breach the Service Abroad Agreement." The Director ultimately concluded as follows:

Because the government was not afforded the opportunity to address or resolve any other concerns prior to your departure, and because you provided no extenuating circumstances to justify your decision to breach the Service Abroad Agreement and return after approximately one month at Post without first attempting to resolve your concerns, I have decided that you should be held liable for all costs associated with the [relocation].

In view, then, of the attention given plaintiff's claim and the thoroughness of the agency's findings, we are unable to conclude that the decision it reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Plaintiff contends, however, that the decision is flawed because it failed to consider an important aspect of the problem, namely plaintiff's safety and security concerns about her workplace.[10]

10. Plaintiff additionally argues that the agency's determination was not based on sufficient evidence—and therefore should fail as a matter of law—since she was not permitted to call or cross-examine witnesses at her oral hearing and the hearing officer failed to conduct any investigation into plaintiff's allegations of safety violations and base mismanagement. In a footnote in her final brief, plaintiff also challenged the impartiality of the hearing officer, noting that the officer violated applicable regulations by (1) issuing a "recommendation" rather than a final or-

der; (2) submitting her findings in draft form to the agency ex parte; (3) subjecting those draft findings to comments and modifications from the agency but not from plaintiff; and (4) declining to provide plaintiff with a copy of the findings until the agency's review was complete.

With respect to the adequacy of her oral hearing, plaintiff cites no authority for the proposition that she is entitled to such an extensive adversarial proceeding. We are thus unwilling to deem the process employed by the agency—a

*Motor Vehicle Mfrs. v. State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (noting that an agency decision "would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem"). In particular, plaintiff points to a series of urgent, high-priority cables from the Acting COB to CIA headquarters after her departure as confirmation that off-base housing required additional security measures and could not be made safe or be brought into compliance with applicable standards until almost nine months after plaintiff's arrival at the post. Indeed, a document titled "Appeal," hand-dated August 12, 1999, notes that "[i]t is Ms. B's position that corrective actions taken shortly after her return with respect to virtually all of her complaints (housing adequacy, residential and workplace security, and post management) demonstrate the validity of her argument that her return was clearly for personal reasons of significant interest to the Government."

It is worthy of note, however, that the same appeal document observed that the Agency Office of General Counsel "acknowledged that changes at the overseas post had been made subsequent to Ms. B's return, but concluded that these changes had no relevance to Ms. B's claim." Beyond that assurance that the agency reasonably considered and addressed such a concern, we are in no position to challenge the agency's conclusion, both because base security and management lies outside our purview and because the taking of new evidence does not fall within the scope of our proceeding. *See, e.g., Robinette*, 439 F.3d at 459 (overturning the trial court's receipt of new evidence and identifying as "the focal point" for APA review "the administrative record already in existence, not some new record made initially in the reviewing court").[11] Similarly, although we are unwilling to accept defendant's arguments that the standards set forth in the FAM and FAH are merely "aspirational" or

that the regulations on which plaintiff relies state only a "preference" rather than a requirement for dwellings with a wall or fence, we are in no better position than the agency to apply its regulations and we find that it has reasonably done so.

Finally, we agree with defendant that the agency must be afforded an opportunity to remedy the deficiencies in its housing assignments and we can find no fault with the agency's conclusion that it was not afforded that opportunity. Even if plaintiff were correct that the living conditions she faced could not have been fixed within a reasonable period of time, we cannot conclude from that fact that she had no other realistic choice but to leave her duty station. This is particularly the case where the government provided a hotel at its own expense. In addition, we do not need to reach the question of how long is too long for plaintiff reasonably to remain in temporary housing because the three weeks plaintiff served of her two-year assignment is simply not enough. Accordingly, the agency's determination must be upheld.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied. The Clerk shall enter judgment accordingly. No costs.

procedure that included both the opportunity for plaintiff to provide testimony and repeated consideration of her claim—insufficient as a matter of law. As to plaintiff's first-time complaints against her hearing officer, we can make no findings, since plaintiff has provided us with nothing more than bald and unsubstantiated allegations.

11. Although we allowed defendant to depose plaintiff on December 19, 2005, to allay its concern that the affidavit submitted by plaintiff in support of her opposition to defendant's motion for summary judgment contained assertions that had not been presented to the agency, our present findings are based exclusively on material contained in the original record.